# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-444

A PLUS HOME CARE SERVICES, LLC

VERSUS

A BLESSING PERSONAL HOME

CARE SERVICES, LLC

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2018-1801
HONORABLE MICHELLE M. BREAUX, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and Van H. Kyzar, Judges.

**AFFIRMED.**

**Lucretia P. Pecantte**
**Attorney at Law**
**124 West Washington Street, Suite B**
**New Iberia, LA 70560**
**(337) 374-1202**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **A Plus Home Care Services, LLC**

**Amanda Ann Martin**
**420 South Iberia Street**
**New Iberia, LA 70562**
**(337) 374-1202**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **A Plus Home Care Services, LLC**

**Travis J. Broussard**
**Attorney at Law**
**130 South Audubon Boulevard, Suite 109**
**Lafayette, LA 70503**
**(337) 534-4242**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **A Blessing Personal Home Care Services, LLC**

**Christopher C. Johnston**
**Johnston Law Firm, LLC**
**7830 Sage Hill Road**
**Saint Francisville, LA 70775**
**(225) 763-1244**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **A Blessing Personal Home CareServices, LLC**

**Kevin J. Gillie**
**Attorney At Law**
**205 Blount Road**
**Baton Rouge, LA 70807**
**(469) 222-6437**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **A Caring Home Care Services, LLC**

**Sarah E. Aycock**
**Attorney at Law**
**628 North Fourth Street**
**Baton Rouge, LA 70802**
**(225) 342-5631**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Louisiana Department of Health**

**GREMILLION, Judge.**

Plaintiff, A Plus (A Plus) Home Care Services, LLC, appeals the judgment in favor of the Defendant, A Blessing (A Blessing) Personal Home Care Services, LLC, in this contract dispute. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

A Plus entered into a contract to sell its business intellectual property, goodwill, and book of business to A Blessing in November 2017 for $225,000.00 with $100,000.00 paid at closing and the remaining $125,000.00 payable over the course of 36 months beginning January 1, 2018, in the amount of $3,747.36 per month. A Plus provides home care services to individuals with developmental delays; the fees for these services are paid by the Louisiana Department of Health.

A Plus filed a Petition for Breach of Contract, Injunction and Damages on March 20, 2018,[1] urging that A Blessing breached the contract because it failed to make any payments. A Blessing filed an Answer and Reconventional Demand on April 24, 2018. A Blessing's reconventional demand alleged damages for bad faith breach of contract by A Plus because:

> Moreover, despite representations of the Plaintiff/Seller with regards to the book of business including sixty to seventy clients, Defendant was only able to effectuate the transfer of 29 clients through the Louisiana Office of Citizens with Developmental Disabilities as the others had already been transferred to A Caring.

It alleged that A Plus's own bad faith caused Defendant's failure to perform. A Caring Personal Home Care Services, LLC (A Caring) is a competing home care business owned by Danille Pecantte and Omar Pecantte, children of the owner of A Plus who were formerly employed by A Plus.

---

[1] A Plus's initial suit and appeal (21-257) are included in this record as an exhibit.

Following a hearing in January 2021, the trial court granted a protective order relating to the acquisition of LDH records, set a new trial date for March 22, 2021, and signed a judgment on January 28, 2021. A Plus filed a motion for appeal seeking to appeal the trial court's January 28, 2021 judgment. However, we issued a rule to show cause why the appeal of a protective order and setting of a new trial date should not be dismissed for having been taken from a non-appealable, interlocutory ruling. We dismissed the appeal and permitted A Plus to file an application for supervisory writs. A Plus's application for supervisory writs was denied in September 2021.

In September 2023, A Blessing filed a motion to file its first amended, supplemental, and restated reconventional demand alleging more details about the pre-closing transfer of clients by Danille Pecantte from A Plus to A Caring. It alleged that:

9.
By four (4) days post-closing, A Plus had transferred to A Caring more than a third of the book of business it had sold to A Blessing only four days prior.

10.
During and after the clandestine raid of patients, A Plus refused to provide to A Blessing information necessary for A Blessing to invoice Medicaid for the services it was providing to the patients post-closing.

11.
Instead, A Plus required that A Blessing use an A [P]lus agent, son and A Caring owner, Donnie Pecantte, to handle the A Blessing billing for the retained patients at an expense of $1,000.00 per week.

A Blessing alleged bad faith by A Plus for "diverting the valuable assets sold to A Blessing[.]" A Blessing filed a second amended, supplemental, and restated reconventional demand on January 31, 2024, relating to Danille Pecantte's admission that she is the owner of A Caring. Following a February 27-29, 2024 trial, the trial court ruled in favor of A Blessing in a 5-page "judgment" signed on May

2

29, 2024. A Plus timely appealed. The judgment, however, failed to state any decretal language. Thus, on August 21, 2024, we suspended the appeal and remanded to the trial court to amend the judgment pursuant to La.Code Civ.P. art. 1951 to include decretal language such as the relief awarded.

The trial court filed an "Amended Judgment" on September 5, 2024. The amended judgment added the necessary decretal language as follows:

> **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Judgment be, and is hereby rendered in favor of the Defendant, A Blessing Personal Home Care Services and against Plaintiff, A Plus Personal Home Care Services, LLC and dismissing said claims with prejudice.
>
> **IT IS FURTHER HEREBY ORDERED, ADJUDGED, AND DECREED** that Judgment be, and is hereby rendered in favor of the Defendant's Reconventional Demand.
>
> **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Judgment be, and is hereby rendered in favor of the Defendant, A Blessing Personal Home Care Services, LLC in the amount of NINETY-SEVE[N] THOUSAND, SEVEN HUNDRED NINETY-THREE DOLLARS AND EIGHTS-SIX CENTS ($97,793.86).
>
> **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that judicial interest shall run from the date of legal demand; and
>
> **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that each party bear their own costs.

A Plus filed a motion and order to suspend briefing pending a November 12, 2024 hearing in the trial court on its Motion and Order to Strike and/or Reconsideration of the Amended Judgment. In a written opinion dated October 16, 2024, we denied A Plus's motion to suspend briefing, noting that we "retained jurisdiction over this matter, even though we have remanded it back to the trial court for [the] sole purpose of the correction of the deficient decretal language in the initial judgment." The trial court no longer has jurisdiction, and we will proceed with the appeal of the amended judgment.

A Plus assigns as error:

1. The trial court erred by granting a Judgment in favor of the appellee, A Blessing Personal Home Care Services, LLC.'s. Reconventional Demand and against the appellant, A Plus Home Care Services, LLC., and dismissing appellant's claims.

2. The trial court erred by awarding the appellee a judgment in the amount of NINETY-SEVEN THOUSAND SEVEN HUNDRED NINETY-THREE ($97,793.36) DOLLARS AND 36/100 and that interests run from the date of legal demand against the appellant, A Plus Home Care Services, LLC.

3. The trial court erred by in its Amended Judgment by failing to abided [sic] by this Honorable Court's order in violation of Louisiana Code of Civil Procedure Article 1951.

## DISCUSSION

### *Breach of Contract*

We will not disturb a trial court's findings of fact even if we may have ruled differently as long as the trial court's findings are reasonable; the trial court's choice between two reasonable presentations of evidence is never manifestly erroneous. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Moreover, a trial court's credibility determinations deserve great deference as it is in a superior position to assess a witness's testimony and behavior. *Id.*

> "In order to succeed on a breach of contract claim, the plaintiff must prove the existence of the contract, a breach of the obligations therein, and damages." *Ledet v. Campo*, 12-1193, p. 7 (La.App. 3 Cir. 3/6/13), 128 So.3d 1034, 1039. A party to a contract breaches it by (1) undertaking an obligation to perform; (2) failing to perform that obligation; and (3) the party entitled to performance suffers damages from the failure to perform. *Sanga v. Perdomo*, 14-609 (La.App. 5 Cir. 12/30/14), 167 So.3d 818, *writ denied*, 15-222 (La. 6/19/15), 172 So.3d 650. "A failure to perform results from nonperformance, defective performance, or delay in performance." La.Civ.Code art. 1994.

4

*A Caring Home Care Servs., LLC v. de la Housssaye*, 17-31, pp. 2-3 (La.App. 3 Cir. 7/5/17), 224 So.3d 422, 424, *writ denied*, 17-1328 (La. 11/6/17), 229 So.3d 474.

"Contracts must be performed in good faith." La.Civ.Code art. 1983. A party whose performance is defective is liable for the damages caused. La.Civ.Code art. 1994. A party who breaches a contract in good faith is only liable for foreseeable damages, whereas a party in bad faith is liable for all damages that result from the failure to perform. La.Civ.Code arts. 1996, 1997. One will not be deemed to be in bad faith if the mistake is an honest one; bad faith is equivalent to fraud and the conscious choice to do the wrong thing. The supreme court in *Castille v. St. Martin Parish School Board*, 16-1028, pp. 6–7 (La. 3/15/17), 218 So.3d 52, 56, stated:

> The jurisprudence has consistently held that bad faith as used in the context of La.Civ.Code art. 1997 "generally implies actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties." *Dorsett v. Johnson*, 34,500 at p. 5 (La.App. 2 Cir. 5/9/01), 786 So.2d 897, *writ denied*, 01-1706 (La. 9/28/01), 798 So.2d 115.
>
> Courts have recognized bad faith is "more than mere bad judgment or negligence; it implies the conscious doing of a wrong for dishonest or morally questionable motives." *Benton v. Clay*, 48,245 at p. 8 (La. App. 2 Cir. 8/7/13), 123 So.3d 212, 219.

Whether a party is in good or bad faith is a factual determination. *Weeks v. T.L. James & Co.*, 626 So.2d 420 (La.App. 3 Cir. 1993), *writ denied*, 630 So.2d 794 (La. 1994), *writs denied*, 93-2909, 93-2936 (La. 1/28/94), 630 So.2d 794.

The trial court, in extensive written reasons, found in part:

> A Plus breached this duty and failed to perform its contractual obligations on several levels.
>
> . . . .
>
> . . . Plaintiff, A Plus, did not meet its own burden of proof to establish that the Defendant, A Blessing, breached the contract.

5

However, the Court finds that the Defendant, A Blessing, through its Reconventional Demand, met its burden that A Plus breached the contract, as A Plus had a contractual duty to help facilitate the sale, not to jeopardize it.

## TESTIMONY AND EVIDENCE

The following evidence and testimony were presented at trial.

*Suzelle Coward*

Coward, a program manager for home and community services for the Louisiana Department of Health, testified that her work involves personal care attendants (PCAs), which are highly regulated by the state. She said clients have the right to choose and change their provider. Coward testified that when a change of ownership–or CHOW–occurs, the parties involved have agreed to relinquish their facility need review rights to the new owner. She said that a buyer has to provide a CHOW application.[2] Coward was questioned:

> Q.   Can a company use its existing provider number or license number when they are buying a new company, or do they have to go through the CHOW process?
>
> A.   They have to go through the CHOW process, and also it's their responsibility to contact provider enrollment as far as the billing. But the agency is going to be responsible for the license until the CHOW is approved by the program desk. The CHOW entails an application, letter of intent, bill of sale, and a diagram showing the before the purchase and after the purchase. The license is not transferable.

Coward testified they have no record of A Blessing ever filing an application or a CHOW. She said the department is supposed to be notified within five days of the sale. With regard to the existing clients of the seller, Coward testified:

> Q.   What is the responsibility of A Plus to the clients?
>
> . . . .

---

[2] Licensure of home and community-based service providers is found in La.R.S. 40:2120.3 and La.Admin.Code tit. 48, Pt. I, §5005. The change of ownership of a home and community-based service provider is regulated by La.Admin.Code tit. 48, Pt. I, §5014

6

A. To offer them freedom of choice, to offer them – to let them know that they're being sold and let them decide whether or not they want to stay with that company or they want to transfer to someone else.

She said the seller is responsible for holding a transfer or discharge planning conference with the client and is responsible for the clients until the CHOW is approved, which, in a best-case scenario, can take two months. She testified that solicitation of clients is prohibited. Coward stated it is a violation for the seller to cease servicing the clients as of the date of sale.

### *Omar Pecantte*

Omar testified that he was the assistant director of A Plus and managed the entire operation from 2006 through 2017. He said that when his parents decided to sell the business, he began reaching out to people in the industry including Nathanial Moore. He testified that he negotiated the contract and that the "the main terms that was [sic] covered was [sic] that, after the sale, it was a 15-day window in which he could have brought any dispute or any claims to basically nullify or invalidate the contract . . . after purchase." He further testified that the components of the CHOW were in the contract. Omar said that Moore did not take advantage of the fifteen-day window, nor did he complete the CHOW requirements listed in the contract that are a requirement for licensure.

Omar then reviewed an email he claims to have sent to Moore on November 27, 2017, which states: "Nate, the state contacted us regard [sic] the sale. We need to complete the change of ownership to be in compliance. Omar"

Omar testified that even after the sale, A Blessing continued to bill using A Plus's provider and submitter numbers without obtaining new Medicaid provider and submitter numbers as was required for licensing. He said that A Blessing did not make any payments as agreed to in the contract and that Moore did not contact

him with any issues. He testified that there was no understanding between he and

Moore that A Blessing would keep A Plus's clients. However, the trial court

questioned Omar:

THE COURT:
But Y'all were talking about the clients and they have a free --

THE WITNESS:
Freedom of choice.

THE COURT:
--freedom of choice.

THE WITNESS:
Right.

THE COURT:
And that three weeks prior to the sale, you notified your clients that Nathaniel Moore was taking it over, because they have the free choice.

THE WITNESS:
I have to disclose to them that A Plus is being considered for sale.

THE COURT:
Correct.

THE WITNESS:
And they have -- the clients always have the freedom of choice to either stay, because he's buying the company, meaning that he's going to own and operate A Plus independent of A Blessing.

THE COURT:
I understand. And that's why I'm asking--

THE WITNESS:
Yes.

THE COURT:
--because maybe I misunderstood.

THE WITNESS:
Yes, so--

THE COURT:
But didn't you say something about the clients --

THE WITNESS:

Yes.

THE COURT:

--that he was going to maintain the clients?

THE WITNESS:

Yes, within A Plus, because --

THE COURT:

Right, okay.

THE WITNESS:

--he wasn't just --

THE COURT:

So Nathaniel Moore will maintain the clients of A Plus.

THE WITNESS:

Plus, because he's the owner.

THE COURT:

That's what you said.

THE WITNESS:

Yes. He's the new owner.

THE COURT:

Okay. That's all I needed to clarify.

THE WITNESS:

Yes.

He was then asked by his attorney[3]:

Q.     So what was the -- what was the agreement about? What did you all sell him?

A.     Basically, the -- it was -- no, you can't sell a client. So you're trying to qualify with LDH to get a new license to be able to *take over the existing client base* and continue to provide the services, once LDH approve [sic] the CHOW, change of ownership. You get the new license, because right -- it [the license] can't be transferred, assigned, or sold.

---

[3] We note that counsel for A Plus is the sister of Omar, Donnie, and Danille Pecantte.

Omar then testified about getting new Medicaid provider and submitter numbers. On cross-examination, Omar was directed to his deposition in which he stated several times that his mother was selling "the license" because "That's all she can sell, yes." He was questioned:

Q. . . . And then I said, "What does she have in mind to sell?" You say, "What she was selling was just the general business." I asked you further, "Like what?"

A. Uh-huh.

Q. And then at line 12, you say, "The only thing per Medicaid rules is the license."

A. Right.

Q. "You can't sell clients, because clients have freedom of choice," right?

A. Uh huh.

Q. So the only thing you said you were selling was the license, right? And then I --because I asked you -- I asked you, I said, "She was selling the license for $350,000?" And you said what?

A. I said, "Yes."

Q. Two times, didn't you?

A. Yes.

Q. You said, "Yes, yes."

A. Yes.

Q. And then I said, "Has she ever sold the license before?"

A. No.

Q. And you said, "no."

Omar then testified regarding A Blessing's ability to bill for services. He stated that they gave all of the billing information to Moore but "for whatever reason, [Moore] . . .wasn't able to bill for some reason on their own. But they had all of the

information to bill for themselves." He was then presented with an email sent to Moore by Donnie Pecantte, his brother, who was an employee of A Plus and did the billing but upon the sale created a new company, DLHD Holdings. Omar testified "When Nathaniel Moore took over and was using those same billing codes, he contracted with DLHD Holdings, which is owned by Donnie P. That's correct." He admitted that his brother's company used all of the account numbers set up by his parents. The email sent to Moore by "Donnie P." as he is referred to in the email and by Omar states:

Hi Nat

Omar told me you would like for me to provide billing services for *A Plus*. Below is a list of things I need for the contract.

Omar testified that Moore "may have mentioned it one time" that they (A Blessing) were unable to bill using the information Omar had provided. Thus, from November 18, 2017, through December 6, 2017, A Blessing was unable to bill any clients until Moore signed the contract with Donnie P.

Omar was then shown his deposition from August of 2022, in which he had been subpoenaed to bring any documents or emails relating to the sale of the business but arrived with none, claiming not to have them. He testified he hired someone from Best Buy to recover the emails that he produced at the trial.

Omar was then questioned about the January 9, 2018 letter sent by A Blessing's attorney indicating that the payments would be put into escrow until A Plus provided "all client and employee folders and other operational assets are delivered and an accounting performed of the actual fair market value of the business." He admitted that one day later, on January 10, 2018, he cancelled the Medicaid billing provider numbers so that A Blessing could no longer bill. Rather

11

than being in retaliation, Omar said it was because Moore was violating the licensing standards. He admitted that no one was copied on the email he sent cancelling the account numbers necessary for billing.

Omar was then questioned about exactly what was being sold, and he stated, "We sold the equipment, the intellectual property, the furniture, and we included within the sale the CHOW requirements." When "goodwill" and "book of business" was pointed out, Omar described this as:

> Book of business doesn't–from my understanding of what I know, you can't sell or purchase Medicaid clients. So we had private pay clients that didn't fall under Medicaid rules. So what this contract basically indicated was Nathaniel Moore coming and taking over ownership by following the requirements, because this is a licensed Medicaid provider that requires you to submit the change of ownership and follow the process of becoming the new owner and obtaining new billing codes to be able to provide the same services as the new owner.

Omar could not remember how many clients A Plus had; however, he stated he informed all of them of the move. He then surmised it was between 60 or 70 clients. Regarding the twenty-one clients that signed up to switch to his sister's company, A Caring, Omar stated:

> Q. Okay, all right. And then so now we know -- and in the case of 21 people, they decided to go from your company to your sister's company, right?
>
> A. That doesn't -- this transfer doesn't necessarily means that it happened. The State has to approve a transfer --
>
> Q. Sure.
>
> A. –once the request come [sic] in. So I can't say whether the person went to that company.
>
> Q. I understand. I tried to get those records. I was denied.
>
> A. Okay.
>
> Q. So I'm sorry I can't show them to you.

12

A.    Well --

Q.    But this is the one I have.

A.    That's all I can say.  There was a request, but it doesn't mean that the State approved the request.

Q.    I understand what you're saying.  I got it.  But here's my questions.  So we know that this happened.

A.    Right.

Q.    The fact that this -- this happened, did you disclose that to Nathaniel Moore?

A.    I don't know.  I don't know a [sic] customer left or not.

However, Omar then admitted that he was associated with A Caring and had access to all of its records including the client service tracker that provides every client name and their start and end date.  He was asked:

Q.    So -- so then you would have had everything you needed to know if they actually transferred or not?

A.    No.  That's not-- that's not-- with all that document, I can't tell you who was-- if those clients actually transferred, because I resigned from A Caring.

However, Omar could not recall when he resigned.  When questioned by the trial court, Omar testified:

THE COURT:
    Okay.  So it's your testimony that you-- all you did was make the phone calls and at that point they chose where they wanted to go, if in fact they wanted to go?

THE WITNESS:
    Correct.

As of November 15, 2017, Omar was listed as the contact person for A Caring and Donnie P. as the contact person for A Plus.  Regarding the twenty-one transfer requests, the majority were completed on November 3 and 6, 2017, and a few after

13

the sale. Omar admitted that he was associated with both companies but denied ever seeing the transfer request forms or following up with any of them.

Omar was then asked about the non-compete provision in the contract:

A. A comprehensive covenant not to compete or propose a non-compete in the distance and time, for example, not to own, operate, and invest, nor consult for any business of this type nor any business servicing the--

Q. Okay, all right. So with a provision like that, like you don't feel that you guys would have had a duty to disclose that those 21 requests for transfers that were done at the time you testified you were making these calls, that you had a duty to disclose that--

Omar answered no and stated that provision only applies to his mother and father, who signed the contract. Omar later stated regarding what was being sold:

This contract was not about purchasing clients. It was about a license to be able to be reissued, along with the process being put. Once stability with the new owner would have been established, then the customer's gain a rapport and maybe would have stayed; maybe not. It's still their choice.

The trial court questioned Omar regarding why he had no idea if 21 clients arrived at A Caring, and he stated he only handled licensing. Counsel then asked why Omar was the primary contact for a request of transfer on the state's listing of available agencies. Omar said it was because he knows the rules and regulations.

*Ryan Elliot*

Elliot oversees data operations at PRN Funding, an Ohio company. PRN advances portions of payments to providers, such as A Plus, that are expected from Medicaid and then reduces the payment by a fee once the funds are received by Medicaid and remits the remainder to the provider. This allows smaller, growing companies to be able to meet payroll while waiting for payments. He testified that he made one deposit to A Blessing in the amount of $40,523.95 on December 28,

2017, at the direction of Omar and Donnie. Elliot testified he had a business relationship with A Caring since 2017 through the time of trial.

### *Rashida Charlot*

Charlot, the executive director of home care for Moore's businesses, including A Blessing, testified that she oversees Moore's agencies, stays in compliance with state regulations, conducts pop-up visits at offices, and makes sure everything goes accordingly. Charlot described the process of transferring from one company to another depending on the type of care the person receives. There is long term personal care, community choice waiver, and SIL.

Long term personal care services (PCS) amount to between eighteen and thirty-two hours of care per week; direct service workers assist with activities of daily living. If a PCS client wants to transfer services, they have to contact long term and state what agency they would like to go with. PCS clients have assessors. To transfer, a document is sent to the state advising of the change. Regarding who handles the paperwork for PCS clients:

> Well, it varies from time to time, case-to-case basis. It could actually be whoever the client has referred to help them or, if its an agency that they may be inquiring to transfer, they may be able to walk them through the process as well. So the situation is different, so its definitely up to the client discretion.

She said the new agency could submit the client paperwork for a transfer but that it would be unlikely that the old agency would submit it unless the client could not be assisted at all by the company.

Community choice waiver clients are able to go into the communities and go on outings. Waiver clients have to contact a support coordinator (another company employed by the state), and the support coordinator decides if the client can be released. The support coordinator handles the plan of care for waiver clients.

Charlot testified that in her thirteen or fourteen years of experience she had never encountered an instance where the state did not approve a transfer.

Regarding the purchase of A Plus in November 2017, Charlot testified that she sent time sheets to Donnie, who did the billing because "we requested the passwords to get into the accounts but were unable to do so. The passwords were the wrong passwords and user names." She stated that A Blessing's biller, Elijah Jenkins, requested the passwords so that they could bill time sheets to pay employees, but he was unable to. Charlot then reached out to Donnie to request the passwords. However, she said that Donnie only provided incorrect passwords. They were unable to access remittance statements or client tracker reports which list the clients' names and their Medicaid start and end dates.

Charlot reviewed weekly emails sent by Donnie beginning one week after the sale in which he stated he was doing the billing. On December 14, 2017, Donnie sent an email to Charlot stating he would need his invoices to be paid up front before he would do any more billing for the agency.

On cross examination, Charlot was asked about the CHOW. Charlot said she could not complete the CHOW because A Blessing never received the license. She stated that when you purchase a new company, you have to input the old license number in the application in order to apply for a new one.

### Christy Sawyer

Sawyer, the long term personal care services contract manager and long-term care access contract manager for the Louisiana Department of Health Office of Aging and Adult Services, discussed an exhibit of 54 long term PCS clients (no support coordinators or case managers).

16

During this witness's testimony, it was stipulated that there were 54 clients total, 27 went to A Blessing, 21 went to A Caring, and 6 went someplace else. This stipulation only relates to long term care clients rather than waiver clients.

***Elijah Jenkins Jr.***

Jenkins testified that he owns a medical billing and coding company. Jenkins stated he had been doing the billing for A Blessing since 2012 as an independent contractor. He testified that he bills for 15 other companies. Regarding initiating billing for A Blessing, Jenkins testified:

> I never got to bill anything because, when I requested the information, it was -- the first day, they gave me a password but it wasn't – it wasn't a user name and password for -- that a biller would receive. It was like a user name and password for a DSW (Direct Services Worker). So I couldn't use it to do what I needed to do. There's a certain-- I need to be able to get to the API key, and I need to be able to have access to LA Medicaid to start audit and stuff. And the user name that they gave me wasn't -- wasn't, I guess -- wasn't good enough -- wasn't – it wasn't a supervisor role password that they gave me.

Jenkins said that when a company buys another, sometimes they will leave everything the same if there were no issues. But, if there were some kind of a fraud or other issue, the clients would be moved over to the purchasing company. He said it takes the state anywhere from 3 to 6 months to move a client over. Jenkins said, in his experience, the purchasing company would use the license and log in info of the seller company.

> Regarding the change of ownership process, Jenkins was asked:
>
> Q. . . . .Once the contract is drawn up, the parties sign it, what has to happen next for a change in the ownership, according to the State of Louisiana?
>
> A. You submit paperwork to the provider -- provider, I believe.
>
> Q. Okay. And what paperwork do you submit?

17

A.    That's the provider -- it's in the packet.  It's the change of ownership paperwork you submit in the packet, but --

Q.    And --

A.    -- that should be in the contract, in regards to completing that.

Q.    Uh-huh, okay.  But you can't sit here specifically outlining for the Court what is required by the State, like step one, step two, step three, because do you know that or --

A.    It's-- you log on, to LA Medicaid.  It's a form you print out and the owner sign [sic] it, and they e-mail it in, I believe.  It's on LAMedicaid.com.

Q.    Okay.  And what does that do, that-- that paperwork? What does that do?

A.    You submit it to the State, and then you have to wait usually six months to a year sometimes for them to complete their end of it and-- before they will fully do everything.  But that's why the contract is really the binding thing.

Q.    Okay.

A.    And if any aspect, any complication happen, the State later just puts their hands up.

Q.    All right.  And my thing is this.  Does the-- you're talking about licensing or are you talking about Medicaid, because that's two different things?

A.    Yes.  The enrollment is the licensing of the company and they document-- they document the change of ownership or if a new owner comes in.  That happens through provider enrollment.

Q,.    Is that Medicaid or that's health standards?

A.    That's the State.

Q.    Okay.  The State is-- I'm confused, because is there two agencies that you have to submit this information to or just one agency?

A.    No, just the provider enrollment from Medicaid, provider enrollment.

Q.    Okay.  So that's so you can get your billing done?

18

A.     No.  That's for -- that's for the change of ownership.  Billing is completely different.

Q.     Okay. Tell me about billing.  What does the State require for billing, when you have a change in ownership?

A.     You have to wait for -- in regards to that, the contract would allow him-- allow the new company to allow me to do the billing for him.

Q.     Using whose provider number and whose submitter number?

A.     That would be using the company he's acquiring.

Q.     Okay.  And that's in the Medicaid regulations?

A.     No, that's going to be in the contract.

Q.     Okay.  Well, what does the Medicaid regulations say about using a provider number and a submitter number of the acquiring company?

A.     You would have to use that, unless you (inaudible) all the other-- all the clients over.

Q.     So Medicaid--

THE COURT:
        Unless you what?

COURT REPORTER:
        Yes, repeat that, please.

THE WITNESS:
        Unless -- yes, you would have to use -- you would have to use like -- if I'm -- if A Blessing is buying A Plus, I can't bill any of those clients with A Blessing's information, because all those clients is [sic] going to be attached to A Plus.  So it's [sic] no way for me to bill them without A Plus's information.

Q.     Okay.   And the State of Louisiana rules and regulations, Medicaid say [sic] that you use the previous company's provider and submitter number?

A.     Yes.  That's the only way you can bill them until -- if you're acquiring that company, you will be billing those clients under that company, unless-- unless or until you move them over to your company.

Q.     Okay.

19

A.    But you can acquire a company, take over their -- take over their NPI number, take over their provider number, and you can bill all those clients under that company's provider number and NPI number --

Essentially Jenkins stated that while the new company has to submit a change of ownership to the State and eventually have everything put in their name, the buyer can continue to use the provider and submitter numbers according to the contract.

*Danille Pecantte*

Danille, Omar and Donnie's sister, testified she was employed by A Caring, but she did not remember how long she had worked there, but maybe it had been eight or nine years.  She said she started as a receptionist and that her sister, Thelma, had opened the business.  Danille said she was now the owner, having gone from being a receptionist to the owner in 2018 or 2019.  Her testimony proceeded in this fashion:

Q.    Okay. All right. How long were you at the company before you became the owner?

A.    I don't remember.

Q.    You're not sure?

A.    Not sure.

Q.    Was it months, was it years?

A.    I can't remember.

Q.    Okay. All right.  What month in 2018 did you become the owner?

A.    I can't remember.

Q.    You're not sure?

A.    Uh-huh, can't remember.

Q.    Okay.  How did you become the owner? Did you purchase it?

A.    Can't remember.

Q. You're not sure if you purchased it?

A. I can't remember.

Q. Okay. Was it donated to you?

A. I can't remember.

Q. Okay.

After being instructed by the trial court to answer the questions, she answered:

A. Probably was donated, I'm thinking.

Q. Okay, well, in your own words, how did the process go?

A. Me talking with my sister one day.

Q. All right.

. . . .

Q. All right. Tell me about it.

A. She just say [sic] she was tired and if I would want to take over. And I told her that's fine, whatever she wanted to do.

At her August 2022 deposition, Danille stated she was a clerk and answered the phone, but she was confused at that time. Although Danille claimed to be a contract worker for A Plus, at her deposition, she denied ever being paid by A Plus. She did not know what Omar did at A Caring and did not know when her mom sold A Plus. She said A Caring had four employees. Regarding the 2018 transfer requests, she was questioned:

Q. Who at the company was responsible for submitting to the State voluntary transfer requests?

A. Oh, I don't know.

Q. You don't remember who handled that?

A. No. I sure didn't.

21

Q.     All right.  Do you know anything about presenting community choices to clients?

A.     No, sir.

Q.     Okay.  Do you know anything about discussing freedom of choice with clients?

A.     No, sir.

Danille did not know how many direct service workers A Caring employed or how many clients the company has.  Despite owning the company, Danille did not know what Donnie did at A Caring or whether he was an employee or contractor.  She said Donnie does the billing as of the date of trial, but she did not know when he started billing for A Caring.  The trial court asked:

THE COURT:
Before you start that, I just want to make sure.  You own -- you began ownership of the company in 2018.  Am I correct?

THE WITNESS:
Yes, ma'am.

THE COURT:
You still have owner -- you still are the owner today?

THE WITNESS:
Yes, ma'am.

THE COURT:
And you don't' know how many clients you have, you don't know what responsibilities your employees have, you don't know anything about the business?

THE WITNESS:
No, ma'am.

THE COURT:
Okay. Thank you.

Danille denied signing the witness line on twenty different transfer forms transferring care from A Plus to A Caring between November 2017 and February

2018. She testified that she did not know anything about the forms or the people requesting transfer.

*Joan Martin*

Martin, a CPA since 1990 and partner with the firm of Wright, Moore, Dehart, Dupuis and Hutchinsons in Lafayette, testified that she has been the head of the litigation, fraud, and forensic department for over twenty years, managing a staff of about sixty-five to seventy people. She was qualified as an expert in the fields of forensic accounting and economic loss. In determining if A Blessing suffered a loss, Martin testified she:

> reviewed literally thousands of documents but mostly they pertained to statements -- bank statements that Mr. Moore's office presented to us, giving us detailed list of deposits he had gotten in relation to his business. We also reviewed documents supplied by the Louisiana Department of Health that gave us information on the number of patients that A Plus, the seller, had at the time of the sale to A Blessing. We also reviewed documents that I'm going to refer to as remittance statements, which is basically the Louisiana Department of Health summary of the units of service that are provided and the price for those services provided to clients, under the care of these agencies.

She reviewed emails. She used a time period of November 17 through November 25, 2017, to examine the bills submitted to the Molina (Medicaid billing) system by A Plus. She examined the 21 transfer forms indicating "I want to move from A Plus to A Caring," but noted that the forms were pre-printed by someone and were not a form generated by LDH or Medicaid. In her calculation of loss, Martin testified she was looking at how many clients A Blessing serviced for which they were unpaid. Martin was questioned:

> Q. Okay. And so am I understanding correctly that -- that there are periods where Mr. Moore was servicing the clients, paying to service the clients, and wasn't able to bill the services that were provided to those clients.
>
> A. Absolutely.

Martin then testified about four types of losses suffered by A Blessing. Group A losses consisted of payments by A Blessing for services to clients (some of which eventually transferred to A Caring) rendered by DSWs subsequent to the sale through December 23, 2017. Group B losses consisted of payments by A Blessing to DSWs for clients who transferred to A Blessing spanning the period from December 24-30, 2017. Group C losses were for payroll spanning December 31, 2017, through March 24, 2018. Group D losses related to the twenty-one clients who moved to A Caring.

**<u>Group A Loss</u>**

Martin said A Blessing only received payments through December 9, 2017; she further testified that Donnie indicated several times that he was billing for services that are refuted by the records because Molina has no record of it, or the account numbers had already been cancelled. These include the weeks of December10 through December 16, 2017 (amounting to $22,045.21) and December 17 through December 23, 2017 (amounting to $24,401.88).

Martin then reviewed the emails in which Donnie billed $1,000.00 per week for bills he did not submit because he emailed Rashida telling her he was billing after the provider numbers had already been cancelled.

Martin further stated that A Blessing had no information available to it about post-sale clients until Donnie submitted the first billing. Although Donnie knew who the clients were, A Blessing at that time had no records of what clients it was servicing, nor could A Blessing know what clients came over from A Plus until reports were generated from the state in late December listing the services provided. In essence, A Blessing was still providing services to some clients who had signed forms to transfer to A Caring because it takes the state time to transfer the billing

information. Thus, according to Martin, all of the clients who signed forms stating they wanted to transfer to A Caring were still being serviced by A Blessing for which A Blessing received no payment. The only way A Blessing was able to determine this was based on clients slowly falling off the remittance list over the course of several months. Regarding the clients who signed the form but were still being serviced by A Blessing, Martin testified:

> THE COURT:
> So is the client in limbo? Who's billing for the client?
>
> THE WITNESS:
> Well, that a good question, because at-- and when we started -- when we started analyzing this, we actually did call them limbo clients, because we weren't sure. We were like okay, we know that Mr. Blessings – Mr. Moore with A Blessing is servicing them. We know that. We can see the payroll. We can see him paying the people to service these clients. Our question was who gets to bill them. We're having trouble getting Donnie to bill them. Is A Caring billing them? Who's billing them? We don't know who's billing them. It seems like -- and I -- I don't know, because we don't have A Caring's records. That's a different entity. It seems like what happened, from the evidence I have looked at, is Mr. Moore serviced them. And as they dropped off, A Caring picked them up. So the State got a free run.

Martin noted that she could not say with certainty that the clients ended up at A Caring, but the twenty-one clients who were serviced by A Blessing and dropped off of the remittance forms over time were all ones who filled out the transfer requests signed by Danille. Martin said that Donnie, as the biller for A Plus, A Blessing for some time, and A Caring would know which clients were moved to A Caring. She noted that someone at A Caring would have had to sign to accept assignment of the clients. The bottom line, according to Martin's testimony, was that A Blessing provided services for two billing periods and did not get paid for it. These Group A losses totaled $46,447.09.

## Group B Loss

The Group B losses spanned the period from December 24 through December 30, 2017, and were comprised of the billings Donnie should have submitted for services provided by A Blessing that A Blessing was prevented from doing so themselves. These clients eventually were "transferred" to A Blessing, but A Blessing did not receive payment for the services provided during this period because they could not bill, and Donnie did not bill as he agreed to. The Group B loss totaled $17,259.07.

## Group C Loss

Martin relied on payroll records of caregivers that A Blessing paid and were unable to bill for from December 31, 2017, through March 24, 2018. Once A Blessing was able to start billing for its DSWs, the amount was taken off the list to be included in the calculation. This loss amounted to $34,087.76.

## Group D Loss

Finally, Martin testified to the Group D losses comprised of the twenty-one clients that presumably moved to A Caring. Martin calculated an average daily loss based on the twenty-one clients, but did not calculate a time period, leaving that for the court to do at its discretion. Martin stated:

> So we know that the evidence shows that 21 clients were moved to A Caring. Certainly had those clients, you know, despite free choice, despite everything, certainly if those clients would have been with A Plus, A Plus would have retained them for a certain amount of time. We don't know how many days. We don't know how many months.

She described her calculations as a tool rather than a time period for the court to consider:

> . . . we know 21 left. All right? We believe from the evidence that they went to A Caring. And we believe from the evidence that A Caring knew about this, prior to the date of the sale. All right? So if that's true

and if the Court decided, "Hey, you know, maybe there's something to this. Maybe this is a correct assumption," then this is a daily amount of revenue that that company lost -- A Blessing lost, for not having had the chance to move those over to his – to his care agency.

Martin calculated the average daily billed amount for the twenty-one clients at $938.34 per day. She determined that most clients are with the provider for 11 months.

On cross-examination, Counsel attempted to argue that the billing arrangement with DLHD had nothing to do with the sale from A Plus to A Blessing because the A Plus contract was signed by Gladys Pecantte while the DHLD contract was signed by Donnie Pecantte. Regarding the obligations owed, Martin was asked:

Q. Okay. So this contract or these billing issues have nothing to do with the old A Plus?

A. It is the old A Plus --

Q. It's the old --

A. -- that he purchased.

Q. That he purchased. But it has nothing to do with my client who was the previous owner.

A. Your clients were the sellers.

Q. Yes, the sellers. It has nothing to do with the sellers, correct?

A. I don't know if you can say that, because it's the same entity. So I'm not sure --

Q. Okay. It's the same entity.

. . .

Q. And we're here for a breach of contract regarding -- let's call it the old A Plus.

A. Okay.

Q. Is that fair to say?

Counsel then suggested that the purchase agreement signed by Gladys Pecantte and Moore and the billing contract is between DLHD and Moore, again arguing that that agreement has nothing to do with the sale of A Plus. Martin disagreed:

A.      When A Plus sells to A Blessing --

Q.      Uh-huh.

A.      -- A Plus has an obligation to service the clients until they're transferred. All right?

Q.      Okay. Which A Plus?

A.      The old A Plus.

Q.      The old A Plus, okay.

. . .

A.      So when they abdicate that responsibility to Mr. Moore and say, "I'm not going to service them after this date. I'm going to wait until they transfer," or whatever happens at that point in time --
Q.      Uh-huh.

A.      -- all right? They are giving their responsibility for the care of those clients over to A Blessing.

. . .

A.      But that does not relieve –at that point in time, that does not relieve their legal responsibility to service those clients. They can't abdicate that responsibility.

. . .

A.      If a care agency could sell to another care agency today and say, "I'm done," how do we know that care agency is an approved agency? I -- I and the other guy both have some responsibility to those clients. I can't just say, "Hey, today I'm done. I sold them. I'm out of here," because I've got some clients. So when you're saying that that agreement doesn't involve them, it involves both of them, in a way that they need to cooperate to make sure those clients get cared for and get -- and somebody gets billing. They are going to agree -- in this purchase agreement, they're going to do everything they can to make sure that

that transactions happens and that everything goes smoothly and that those clients are taken of.

Martin testified that the state never received a CHOW from the seller or the buyer, just a letter from the seller. Counsel again tried to argue that the contract between DHLD had no relevance pertaining to the sale of A Plus. Martin again testified:

> So that billing agreement would not have happened, if in fact Mr. Moore would have been given the keys to the door. If he had the ability to bill, he certainly would not have entered into an agreement at $1,000.00 a week to have Mr. Donnie Pecantte bill. So to say that Miss Gladys is personally responsible, no. But to say that this agreement and this transaction doesn't involve both companies, I wouldn't agree with that.

Martin testified that they could not get the A Caring remittances, but LDH received the forms requesting transfer since they were provided after subpoena. She said the logical conclusion is that they transferred to A Caring.

### Nathaniel Moore

Moore testified that he owns eighteen companies, four of which are PCA companies. He described the closing process when he purchased the business and described the billing and client continuity as the most important aspects of a sale. Regarding the clients, he stated:

> Q. Okay. Did you guys discuss that anybody would be visiting the clients with you?
>
> A. Yes. So Omar originally said that he was going to visit the clients with me, that he was going to make the visits with me, just so that way the client -- because again, in this business, it's all relationship. . . . And it's who the clients know. . . .And so it's important that whoever that relationship is with is who they will typically trust, whenever they are approached at the home. And so after buying the company, I said, "Hey, look, I" -- in the last process, "Hey" -- the owner or representative of the company that deals with the clients and has that relationship, go and introduce and talk through that and issue them the freedom of choice or the option and just to say, "Hey, look, we sold this company. This is the new owner. You have an option whether you

want to [stay] with us or you want to -- want to go with another agency."
And that's ultimately what we had talked about.

Moore described how things were not going according to plan. Although Omar accompanied him on a few visits, Moore did the remainder on his own and found the clients were confused about:

> who I was and the company I represent. And so that's when I knew that somebody had already -- or these clients already had knowledge of a sale and also had knowledge -- or had -- also signed documentation going to another agency. And so that's when I knew -- we're not -- we're not in cooperation with [each] other, as buyer and seller. It seemed like it was a competition at the time, like how -- are they going to these clients before I get to them and -- so now, at this point, I'm in a -- I'm in a crisis at this point, like -- if I'm talking to clients and I'm meeting clients and they're looking at me and they're -- and I'm learning that somebody has already been there before me and has already initiated a transfer, I'm thinking we're not in cooperation. Something is missing, because we had an agreement that -- well, I understood that we had an agreement that I was purchasing a business that had -- that allowed me to communicate with the clients and offer a freedom of choice and an option for them to consider my company as a company that we would service them.

Moore said that no one in the Pecantte family advised him that A Plus clients had signed a request to transfer to A Caring before the sale. He testified that he asked for the billing information within a week of the sale and was provided the login in credentials that his biller, Elijah Jenkins, could not use. At this point in Moore's testimony, Plaintiff's counsel attempted to distinguish who provided the incorrect passwords arguing that DHLD was responsible rather than A Plus as part of the sale from A Plus to A Blessing. Moore noted that Donnie was an employee of A Plus prior to the creation of DHLD. Only subsequent to the purchase did DHLD enter into the contract with Moore regarding the billing.

Moore stated that the DSW workers wanted to be paid, and they had no way of paying them because they could not bill for their services. He said he told Donnie that he needed the correct billing information, and Donnie refused to release the

information and said he would do it for $1,000.00 per week. Moore said they refused to provide the necessary records regarding clients and employees. Moore testified his biller charged $1,500 a month for billing. He said nothing was turned over in order for him to conduct business. He said he felt like he was "handcuffed" and was forced to use Donnie for billing or no one would be paid. Moore received a letter from attorney Amanda Martin on December 6, 2017. On December 7, 2017, he signed with Donnie. Moore said he was surprised by the cease and desist letter that stated he was fabricating receiving the wrong log-in information. The letter stated:

> This correspondence concerns the above referenced matter. I have been retained by A Plus Home Care Services, L.L.C. to handle this matter on their behalf. It is my understanding that pursuant to the Purchase Agreement it was your responsibility and liability to pay all employees upon the selling of the business. My client's obligation to the employees ceased upon the execution of the sale. Several of your employees upon direction from you were told to contact A Plus because my client provided the wrong password. Mr. Moore you know this is a down right fabrication on your part. A Plus sold you business intellectual property, goodwill, and book of business all of which have been provided to you. A Plus in furtherance of its good faith made sure you received all information timely. In addition through statements and evidence you and your employees are making defamatory statements against A Plus Home Care Services. Sir my client has done all it needed to do in accordance with the agreement.
>
> The law provides that if a person knowingly makes a statement that is false and intentionally attempts to bring harm to that person's reputation that is defamatory. On behalf of my client, let this letter serve as formal notice to you to **CEASE AND DESIST IMMEDIATELY** with this conduct or I will advise my client to seek legal action against you.

Moore said no one at A Plus attempted to assist with the passwords. Moore reviewed a January 9, 2018 letter sent to A Plus by his attorney stating in part:

> [T]hat only three boxes of documents have been delivered to A Blessing, and they have still not received the client folders, plans of care, visit notes, policies and procedures, and all other operational assets that one would expect following the acquisition of the business[.]

We understand further that A Plus may have overstated the purchase price in that the book of business ultimately transferred to A Blessing was not what was represented prior to Closing[.] However, without the availability of the balance of the data, folders and operational assets, a final determination concerning that evaluation is premature[.]

It went on to state that the payments would be held in escrow.

On January 10, 2018, the provider numbers were cancelled. On January 11, 2018, Donnie sent an email to A Blessing indicating he had submitted billing after the provider numbers had already been cancelled.

On cross examination, Moore was questioned why he did not exercise his right to cancel within 15 days according to the contract if he was not receiving the things he needed. He stated:

> I don't write people $100,000 checks to cancel contracts and to have confusion and to have lack of cooperation and to fight for things I paid for. I never enter -- never would I think I will be sitting in a courtroom today, seven years later, talking about an agreement that was made seven years ago, and I have 18 transactions that I've done and not one of them have I defaulted on, and not one of them have I paid to full term. I've actually paid every debt earlier than I was supposed to pay for. So in this case, I'm sitting here discussing, after giving $100,000 that I didn't get accurate records, no records, no billing information, all these things that was required for you to give to me, I did not receive those things. And I understand the contract. I don't enter an agreement to cancel a contract. I enter an agreement so that we can do business together and we can both get what we desire. I understand that the con -- what the contract says.

He later testified when questioned why he did not make the payments according to the terms: "Look, you're asking me to pay for another three years or $125,000, when I don't -- at that point, what did I buy?"

*Trial Court's Written Reasons*

The trial court stated:

> First, this Court, during the three (3) day trial, heard testimony from one of the witnesses, Danille Pecantte, an employee and owner of A Caring Home Care Services ("A Caring"). Ms. Pecantte's testimony

32

was not well received by this Court. Furthermore, it considered various factors which influenced its assessment of Ms. Pecantte's credibility. One major factor was Ms. Pecantte's complete failure to remember any information about the company she allegedly owns. Ms. Pecantte testified that she began her employment at A Caring by answering the phone, but eventually became the owner of the business in 2018. As the facts were disclosed, it was discovered that just two (2) weeks prior to the sale of A Blessing on November 3, 2017, Ms. Pecantte was involved in the transfer of clients from A Plus to her competing business, A Caring. These transfers were accomplished by using "pre-printed" forms, twenty (20) of which were allegedly signed by Ms. Pecantte. At trial, Ms. Pecantte testified that she did not remember signing these twenty (20) forms bearing her name and signature. She also failed to give this Court a credible explanation as to who signed these important patient documents that were to be submitted to the state.

Second, this Court discovered through testimony that A Plus provided A Blessing with the incorrect information to access client portals and records, which contained vital material for the company. After the sale, A Blessing began servicing and paying to service its clients immediately; yet, it could not invoice its clients and bill services provided to its clients without A Plus's assistance. This left A Blessing scrambling to pay workers without the ability to simultaneously bill their clients and complete reliance on A Plus to provide it necessary login information to access the client portals. Despite A Blessings's repeated requests, A Plus never provided A Blessing with the correct login information.

Because of this, A Blessing was forced to hire another family member associated with A Plus and A Caring, Donnie Pecantte. Mr. Pecantte played an integral role in the day-to-day operations of the family-owned businesses, A Plus and A Caring. Subsequently, it was determined that Mr. Pecantte was the gatekeeper and custodian of the necessary information to access the portals due to his affiliation with both A Plus and A Caring, as stated above. Eventually, Mr. Pecantte was hired by A Blessing due to the fact that, three (3) weeks post-purchase, A Blessing still could not access portal information due to insufficient passwords and login information. Thus, Mr. Nathaniel Moore, the new owner of A Plus, had to hire Mr. Pecantte at an additional expense of $1,000.00 per week in order to maintain his business, access records, and pay bills. As such, this Court feels that Mr. Pecantte was a critical witness in this case who failed to show up and testify. Overall, these facts regarding login information and billing were crucial to this Court's final determination.

Third, this Court heard the testimony of one (1) expert witness at trial, Joan Martin, who was accepted as an expert in the field of forensic accounting. Martin testified this extensive delay in the production of the passwords and login information caused considerable harm to A

Blessing. As Martin explained, A Blessing was unable to conduct any billing, as it did not fully retain "The keys to the kingdom." Thus the company was forced to pay workers to provide services to its clients without the corresponding ability to bill and collect payment for those services. Martin also identified four (4), specific groups of loss, identified as Groups A, B, C, and D. This extensive testimony by Martin was heavily relied on by this Court.

## ASSIGNMENT OF ERROR ONE

*Bad Faith Breach of Contract*

In this assignment of error, A Plus argues the trial court erred in granting judgment in favor of A Blessing. The object of the contract was the sale of A Plus's "business intellectual property, goodwill, and book of business" to A Blessing. Black's Law Dictionary defines a book of business as:

> 1. A salesperson's list of accounts or clients. Traditionally, the phrase is used in reference to financial advisers, insurance agents, private bankers, investment bankers, and financial planners. 2. By extension, an experienced lawyer's roster of stable clients who are loyal enough to the lawyer to continue sending legal work to that lawyer regardless of which firm the lawyer might become affiliated with.

A debated issue at trial was what was being sold in this contract. A Plus strenuously argued that clients have freedom of choice and cannot be sold pursuant to CHOW provisions. At the same time, A Plus entered into a contract for the sale of a "book of business." A Plus simply cannot have it both ways. One cannot sell a "book of business" while simultaneously claiming freedom of choice prevents the "sale of clients." In any transaction involving the sale of a business, the client always has the freedom to choose their provider whether it be a home health service, insurance agent, or financial service. However, the clear intent of selling a book of business is for the previous owner of the company to facilitate and cooperate with the buyer to transition as many of the clients of the seller to the buyer. That is not what happened here. Instead, the seller stole one-third of the clients by diverting

34

them to another family-owned competing business, A Caring. Once A Plus substantially breached the contract by failing to deliver the promised "book of business," A Blessing was no longer under an obligation to perform. *Commerce Ins. Agency, Inc. v. Hogue*, 618 So.2d 1048 (La.App. 1 Cir.), *writ denied*, 626 So.2d 1171 (La.1993). In *Commerce*, the seller of an insurance agency solicited accounts he sold to the buyer. The court found that "[t]he contract did not authorize [the seller] to solicit the business he transferred to Hogue in the sale and any other conclusion is simply untenable." *Id.* at 1052. We find the same occurred here.

A Plus advanced various other arguments at trial and now in brief in addition to the failure to make installment payments in an attempt to assert that A Blessing breached the contract. Although none of these claims are relevant to A Plus's pre-closing breach of the contract, we will address these issues as they illustrate the ongoing bad faith breach of the contract engaged in by A Plus.

While A Plus repeatedly emphasized that A Blessing did not complete the CHOW as required by statute, this distinction has no bearing on its obligations under the contract. A Plus also failed to meet the requirements of the statute in that it continued to allow use of its license to bill even after A Plus was sold. Referring to A Blessing's purchase "as the new A-Plus" fails to obviate the state regulations. Thus, to strenuously argue that A Blessing breached the contract by failing to meet CHOW is not only irrelevant to the matter at hand, but also hypocritical. A Plus cannot avail itself of the CHOW regulations only when it benefits them. If it had strictly followed the CHOW regulations, it would not have allowed the use of its provider numbers. Moreover, A Plus, rather than assisting A Blessing in the licensure process, instead charged A Blessing $1,000.00 a week to bill as discussed further below.

Throughout the testimony, counsel referred to the post-sale company as "the new A Plus" rather than A Blessing, the listed buyer on the contract. A Plus seemed to purposefully blur the lines between the former company and the new company for its own gain by requiring A Blessing to use the services of Donnie Pecantte through his newly created company, DHLD. Moreover, the cancellation of the billing account numbers only occurred after A Blessing refused to make the first installment payment, when the arrangement was no longer beneficial to A Plus and its various family-owned companies.

Yet another indicator of bad faith by A Plus is the argument that DHLD is a business unrelated to A Plus. In brief, A Plus states: "The parties knew that billing for services was separate because Nathaniel Moore *hired* DHLD, owned by Donnie Pecantte." The evidence proves otherwise. Moore did not "hire" Donnie until he was forced to because A Plus refused to provide valid log in information so that A Blessing could complete the billing themselves. The ability to bill clients is part and parcel of a sale. A Plus's argument that "All parties understood that this was separate from the contract executed between the appellant and appellee" is not supported by any evidence. If it was, there would have been no transfer *at all* of the useless login information. Moreover, the trial court clearly found Martin's testimony credible that Donnie did not even bill on behalf of A Blessing during periods when he was still being paid $1,000.00 a week. Donnie failed to testify at trial and worked for all of the family businesses. To even suggest at trial that the billing issues needed to be taken up with DHLD and had nothing to do with the current lawsuit is disingenuous. All of these businesses are family owned and run by the same individuals who worked at A Plus. They were all deeply enmeshed in the A Blessing transaction.

A Plus was owned and operated by siblings, Danille, Omar, and Donnie Pecantte. About two weeks prior to the sale, A Plus and/or A Caring had twenty-one of its clients sign transfer request forms to move from A Plus to A Caring. The transfer of these clients was not disclosed to A Blessing and/or Moore. In addition to the transfers, A Blessing was unable to properly bill for services rendered because Donnie refused to give A Blessing the necessary information to successfully do so. As a result, A Blessing refused to pay the monthly installments due under the loan.

The trial court did not manifestly err in finding that A Plus breached the contract in bad faith. As noted by Moore, one is left to wonder what he was buying if the "book of business" did not include a cooperative attempt to transition clients facilitated by A Plus to the benefit of A Blessing. The trial court clearly found Moore's testimony credible that A Plus failed to transfer what it was obligated to in order for Moore to operate the business. This initial breach moots the various arguments levied by A Plus regarding CHOW and other state regulations. Whether A Blessing properly completed the CHOW has no bearing on whether A Plus breached the contract weeks before the date of sale when it secretly siphoned off one-third of the clients it was obligated to cooperate with Moore in transferring to A Blessing as part of the sale of A Plus's book of business.

Similarly, the freedom of choice argument fails because the clients were never even given an opportunity to choose A Blessing. These actions, and the testimony or lack thereof to explain them, are an obvious indication of bad faith. Accordingly, the trial court did not err in finding A Plus in bad faith breach of the contract it entered into with A Blessing. This assignment of error is without merit.

**ASSIGNMENT OF ERROR TWO**

*Damages*

In this assignment of error, A Plus argues that the trial court erred in awarding A Blessing $97,793.36 and assessing interest from the date of legal demand against it. "A trial court's award of damages for breach of contract is subject to the abuse of discretion standard of review." *Allain v. Tripple B Holding, LLC*, 13-673, p.5 (La.App. 3 Cir. 12/11/13), 128 So.3d 1278, 1283. The trial court did not abuse its discretion in its assessment of damages. Moreover, whether the clients actually transferred to A Caring, a fact that could have easily been proven but which A Plus bitterly fought to exclude, is not relevant. While Martin opined, and we agree, that more than likely all of those clients did actually transfer to A Caring, the trial court's damage award did not even include a sum for the potential loss of these clients (the Group D loss). A Plus states in brief:

> In essences [sic], without an [sic] evidence Joan Martin's testimony regarding the appellee's losses was based upon assumptions and not actual evidence. Their expert, Joan Martin, based her entire analysis upon assumptions.
>
> . . . .
>
> From the testimony and evidence presented, the appellee had an issue with the biller not the appellant. . . . The testimony points to [the] fact that the appellee again was having billing issues which [sic] had nothing to do with the appellant.

We disagree. For the reasons already mentioned, the "biller" was part and parcel, a literal employee and/or agent, of A Plus. Attempting to characterize the billing issue as having no relation to the sale is absurd when the "biller" is intimately involved in the various family businesses. Also to be clear, the items of damage in groups A, B, and C have nothing to do with the twenty-one clients and where they ended up. The trial court's damage award is the exact total of Groups A, B, and C

as testified to by Martin. The trial court did not award any damages related to Group D. The damages were quantified and not speculative damages based on the twenty-one clients who may or may not have transferred to A Caring. The trial court did not abuse its discretion in awarding these damages based on the detailed evidence and testimony of Joan Martin. Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR THREE

*Amended Judgment*

In this assignment of error, A Plus argues that the trial court erred in failing to abide by this court's order in violation of La.Code Civ.P. art. 1951.[4] A Plus claims that our order was to "correct deficiencies in the decretal language not to the change the substance of the original judgment." We disagree.

The trial court erroneously omitted the decretal language entirely. In the absence of decretal language, a document is not a judgment. *Morgan v. Pardue*, 15-149 (La.App. 3 Cir. 10/7/15), 175 So.3d 1053. The "amended judgment" was the only judgment rendered.

A judgment is the determination of the rights of the parties in an action and may award any relief to which the parties are entitled. La.Code Civ.P. art. 1841. The form of a final judgment is set forth in La.Code Civ.P. art. 1918:

> A. A final judgment in accordance with Article 1841 shall be identified as such by appropriate language; shall be signed and dated; and shall, in its decree, identify the name of the party in whose favor

---

[4] Louisiana Code of Civil Procedure article 1951 provides:

> On motion of the court or any party, a final judgment may be amended at any time to alter the phraseology of the judgment or to correct deficiencies in the decretal language or errors of calculation. The judgment may be amended only after a hearing with notice to all parties, except that a hearing is not required if all parties consent or if the court or the party submitting the amended judgment certifies that it was provided to all parties at least five days before the amendment and that no opposition has been received. A final judgment may not be amended under this Article to change its substance.

39

the relief is awarded, the name of the party against whom the relief is awarded, and the relief that is awarded. If appealed, a final judgment that does not contain the appropriate decretal language shall be remanded to the trial court, which shall amend the judgment in accordance with Article 1951 within the time set by the appellate court.

There was no substance to amend. We agree with A Blessing that the original "final judgment" was no judgment at all without any decretal language. The trial court's September 5, 2024 "Amended Judgment" is the initial final judgment. This assignment of error is without merit.

## CONCLUSION

The judgment of the trial court awarding the Defendant-Appellee, A Blessing Personal Home Care Services, LLC, $97,793.36 plus legal interest from the date of demand, is affirmed. All costs of this appeal are assessed against the Plaintiff-Appellant, A Plus Home Care Services, LLC.

**AFFIRMED**.